IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WALHONDE TOOLS, INC.,

        Plaintiff,

v.                       //   CIVIL ACTION NO. 1:09CV48
                                 (Judge Keeley)

WILSON WORKS, INC.,

NORTHCO CORP.,

NAES POWER
CONTRACTORS, INC.,

MINNOTTE CONTRACTING
CORPORATION, and

FOSTER WHEELER ZACK, INC.,

        Defendants,

<u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court are the parties' motions for summary judgment. For the reasons discussed below, the Court **DENIES** the plaintiff's motions for summary judgment as to infringement and invalidity, **DENIES IN PART** the defendants' motions for summary judgment as to infringement, **GRANTS IN PART** the defendants' motions for summary judgment as to the plaintiff's conspiracy claim, and **GRANTS** the plaintiff's motion for summary judgment as to Minnotte Contracting Corporation's inequitable conduct and false marking counterclaims.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**I.**

**A.**

On April 8, 2009, the plaintiff, Walhonde Tools, Inc. ("Walhonde"), filed this action for patent infringement and conspiracy against Wilson Works, Inc. ("Wilson"), Northco Corp,[1] NAES Power Contractors, Inc. ("NAES"), Minnotte Contracting Corp. ("Minnotte"), and Foster Wheeler Zack, Inc. ("FWZ"), as well as common law claims for tortious interference against Wilson and Northco. Walhonde alleges that Wilson manufactured a copycat version of a patented boiler maker tool ("Wilson's tool") and then sold the infringing tool to the other defendants, all of whom used it in their businesses as power plant repair contractors.

Wilson, Minnotte, and FWZ filed counterclaims for declaratory judgment as to non-infringement, invalidity due to obviousness, and a finding that the case is exceptional under 35 U.S.C. § 285. Minnotte filed additional counterclaims for inequitable conduct and tortious interference but does not object to Walhonde's motion for summary judgment as to those counterclaims.[2]

---

[1] Northco Corp. has not appeared in this case to date.

[2] In Minnotte's response to Walhonde's motion for summary judgment, it concedes that, in light of recent changes in the law, it cannot sustain its counterclaims for inequitable conduct or false marking and withdraws those claims. (Dkt. No. 221 at 2).

**B.**

Walhonde manufactures tools used in the construction and repair of steam boilers for power plants, including the "Bolt-Type Boiler Wall Tube Tool" that is the subject of this case. Boilers of this type consist of series of pipes, or "boiler tubes," that pass through a large vessel containing a heat source. As water passes through the heated boiler tubes, it converts to steam, which is then expanded to drive power-generating turbines. When a boiler design calls for tubes longer than commonly available pipes, individual pipe sections must be welded together, end to end, creating a single continuous pipe. Because boiler tubes typically are arranged parallel to each other as a "wall" or bank of pipes, boilermakers frequently encounter the challenge of welding large walls of boiler tubes together while working in the confined interior space of a boiler.

Walhonde manufactures the "Walhonde Wallbanger" as the exclusive licensee of a patented tool, U.S. Patent 4,936,500 ("'500 Patent" or "patent-in-suit"), that addresses this problem by allowing a boilermaker to temporarily clamp tube wall sections together, end to end, ensuring proper alignment of each pipe section. With the clamp in place, the boilermaker can temporarily tack-weld the abutting ends of each pipe section and then remove the device to permit final welding.

The '500 Patent discloses two tool embodiments, one of which is the subject of this case. Claims 1-3 and 10 describe a tool designed to clamp and align four segments to form two adjacent boiler tube walls. This tool consists of two clamp members connected by a centrally located bolt.[3] One clamp member is placed on either side of the juncture of the four segments so that it straddles the narrow gap between their abutting ends. A threaded bolt passes through an unthreaded bore in the center of the outer clamp member and engages the threads of an internally threaded bore in the inner clamp member to tighten the clamp around the tube walls, holding them in alignment. Recesses along the side of the clamps provide access to the tube junctures for tack-welding. Claims 7 and 8 are directed to the combination of this tool and the boiler wall tube.[4]

Wilson's allegedly infringing tool aligns segments of boiler tube walls through the means of two clamps connected by three vertically aligned bolts, one of which is centrally located.[5]

---

[3] Although the patent-in-suit calls for "exactly one bolt located in the center of the clamp," the Court concluded during claims construction that "[t]his does not mean, however, that other bolts might not appear in various locations on the device." (Dkt. No. 167 at 14).

[4] Walhonde is not asserting claims 4-6, 9, and 11, which are directed to the second tool embodiment, designed to clamp and align two segments to form a single boiler tube wall.

[5] Because the Court concluded during claims construction that other bolts may appear elsewhere on the device, only the center bore is relevant to the infringement analysis. See (Dkt. No. 167 at 14).

Instead of a threaded bore through the inner clamp member, however, Wilson's tool features a smooth bore with a threaded nut tack-welded inside of the bore. The bolt engages the threads of this "captive nut," rather than threads machined directly into the bore itself.

## II.

Walhonde and each defendant have moved for summary judgment on the issue of infringement. Of the eleven claims that describe the '500 Patent, Walhonde alleges Wilson's tool infringes Claims 1-3, 7, 8, and 10, both literally and under the doctrine of equivalents.

## A.

Determination of a claim of patent infringement involves a two-step inquiry. First, the Court must construe the asserted patent claims as a matter of law. Second, it must determine whether the accused device contains each limitation of the properly construed claims. <u>Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.</u>, 261 F.3d 1329, 1336 (Fed. Cir. 2001). To prevail, the plaintiff must establish by a preponderance of the evidence that the accused device infringes one or more of the claims of the patent either literally or under the doctrine of equivalents. <u>Id.</u>

To find literal infringement, each claim limitation must be present in the accused device. "Any deviation from the claim precludes such a finding." <u>Telemac Cellular Corp. v. Topp Telecom,</u>

<u>Inc.</u>, 247 F.3d 1316, 1330 (Fed. Cir. 2001). In the absence of literal infringement, "[t]he doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.</u>, 535 U.S. 722, 733 (2002).

Because claims construction is a question of law for the Court to decide, disputes over the proper meaning of claim terms do not alone raise genuine issues of material fact sufficient to preclude the grant of summary judgment. <u>See</u> <u>Laitram Corp. v. Morehouse Indus., Inc.</u>, 143 F.3d 1456, 1461 (Fed. Cir. 1998) ("Because the parties did not dispute the structure of the accused devices . . . once the issue of claim construction is settled, [the] summary judgment motion for noninfringement did not implicate any issues of fact."). "Summary judgment on the issue of infringement [or noninfringement] is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." <u>PC Connector Solutions LLC v. SmartDisk Corp.</u>, 406 F.3d 1359, 1364 (Fed. Cir. 2005).

**B.**

NAES argues that the Wilson tool does not infringe the '500 Patent because it features a bolt that engages the threads of a

captive nut rather than engaging the threads of an internally threaded bore. In its view, under the doctrine of prosecution history estoppel, Walhonde is estopped from claiming that a captive nut arrangement infringes the '500 Patent because the inventor expressly disclaimed that concept during patent prosecution. When the patentee originally filed his application, the United States Patent and Trademark Office ("PTO") rejected certain claims as being unpatentable over prior art. NAES contends that, in order to make the device patentable, the inventor informed the PTO that he was no longer including the concept of a captive nut and replaced the rejected claims with language imposing the limitation of a threaded bore.

Prosecution history estoppel precludes a patentee from asserting infringement claims against subject matter he gave up during prosecution to obtain a patent. <u>Festo</u>, 535 U.S. at 733. "When the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised an unforseen equivalent." <u>Id.</u> at syll. (b).

In this case, the PTO rejected, in pertinent part, original claims 1 and 2 as being unpatentable over GB 2 189 177 (the "British Patent") and SU 690743 (the "Russian Patent"). Original claim 1 described a clamp used to keep pipes aligned, and original

dependent claim 2 added the limitation of a threaded bore. The PTO

concluded that these claims, by themselves, were not patentable

over the prior art:

> [The British Patent] discloses a tube alignment clamp
> comprising clamp halves which are drawn together with a
> bolt and captive nut arrangement. Although the clamp is
> hinged, <u>the use of two bolts replacing the hinge would
> have been obvious</u> at the time applicant's invention was
> made to a person having ordinary skill in the art <u>because
> the clamp requires more room during installation</u> in a
> hinged configuration than in an all bolt installation.
> The use of alignment clamps in combination with tube
> walls is well known as disclosed in [the Russian Patent.]
> The use of any well known tube alignment clamp for use
> with a tube wall would have been obvious . . . because
> the alignment clamps are equivalent.

(Dkt. No. 218-3 at 152) (emphasis added). Notably, although the PTO

did reject original claims 1 and 2 as unpatentable, its reasons had

nothing to do with the captive nut arrangement, but rather focused

on "the use of two bolts replacing the hinge" in the British

Patent. <u>Id.</u>

The PTO also concluded that original dependent claim 3, which

required at least one center bolt, would be patentable if rewritten

in independent form. <u>Id.</u> at 153. The patentee responded by

canceling original claims 1 and 2 and rewriting claim 3 in

independent form, which emerged as final claim 1 of the '500

Patent. The patentee also added two new claims, 13 and 14 - which

became claims 10 and 11 in the '500 Patent - that describe the

combination of the clamp and boiler tube wall and also incorporate

the center bolt. Explaining this addition, the patentee informed

the PTO of the following:

> New claims 13 and 14 have been added at this time to afford substantially the same scope of patent protection as the allowable claims <u>except that the concept of the captive nut or threaded bore in one of the clamp members is no longer included in these two claims since this feature was not considered a patentable feature in claim 2</u>. Other than eliminating the specific recitation of a threaded bore receiving a threaded bolt, the new claims 13 and 14 correspond with allowable claims directed to the two forms of the invention and are believed to be allowable for the same reasons as dependent claims 3-8.

<u>Id.</u> at 165-66 (emphasis added).

NAES argues that this statement expressly disclaims the

captive nut arrangement. That argument, however, fails to consider

the complete prosecution history. As discussed above, it is the

central location of the bolt, as described in original claim 3,

that made this invention patentable. The PTO rejected original

claims 1 and 2 because they lacked this limitation, and not because

they required either a threaded bore or a captive nut. Because

mention of either a threaded bore or captive nut was unnecessary to

achieve novelty and, thus, not needed to obtain the patent, the

inventor removed the language altogether. By electing not to

reference either configuration, the patentee actually broadened the

scope of the '500 Patent.

Accordingly, the patentee did not disclaim the concept of a captive nut arrangement, and Walhonde is not estopped from asserting that such an arrangement infringes the '500 Patent.

**C.**

FWZ challenges the Court's construction of the '500 Patent and argues that, under its proposed construction, the Wilson tool does not infringe the patent in suit. Although the <u>Markman</u> hearing in this case has concluded, the Court may engage in "rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." <u>Jack Guttman, Inc. v. Kopykake Enters., Inc.</u>, 302 F.3d 1352, 1361 (Fed. Cir. 2002).[6]

**1.**

FWZ first argues that the phrase, "means moving the clamp members towards each other for secure clamping," which appears in claims 7 and 10, should be construed as a "means plus function." So construed, the "means" called for in claims 7 and 10 would correspond to the threaded bolt and internally threaded bore described in the specification.

---

[6] To the extent Walhonde argues the Court should not revisit its claims construction under the law of the case doctrine, that argument is without merit. <u>See</u> <u>Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.</u>, 74 F.3d 1216, 1221 (Fed. Cir. 1996) ("<u>Markman</u> does not obligate the trial judge to conclusively interpret claims at an early stage in a case.").

**MEMORANDUM OPINION AND ORDER**

The use of the word "means" in a claim gives rise to a presumption that the term is stated as a means plus function under 35 U.S.C. § 112, ¶ 6, which provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

This presumption is only rebutted where a preponderance of the evidence shows that the claim element recites sufficiently definite structure or materials to perform the claimed function. <u>Altiris, Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1375-76 (Fed. Cir. 2003).

Here, claims 7 and 10 describe the combination of the clamping device with a boiler tube wall and call for "means moving the clamp members towards each other for secure clamping." The use of the word "means" triggers a presumption that it states a means plus function, describing the corresponding threaded bolt and internally threaded bore described in the specification. § 112, ¶ 6. Moreover, there is no evidence to rebut that presumption. Although claims 7 and 10 describe this means as "bolt means," they do not otherwise recite "sufficiently definite structure or materials" to perform the specified function of drawing the clamps together. <u>See</u> <u>Altiris</u>, 318 F.3d at 1375-76. Without a more definite description, the word "means" is presumed to state a means plus function.

As such, the term "means moving the clamp members towards each other for secure clamping" is a means plus function, corresponding to the combination of a threaded bolt and internally threaded bore described in the specification.

## 2.

FWZ next argues that the Court should revise its construction of the phrase, "one of said clamp members having a threaded bore extending therethrough," in claims 1-3 and 8 to find that it requires a bore that is threaded throughout its entire length, rather than a bore of which "at least a portion is threaded." See (Dkt. No. 167 at 12). Under this construction, FWZ contends the Wilson tool's captive nut arrangement would fail to satisfy the "threaded bore" requirement expressed in claims 1-3 and 8 and referenced in the means plus function in claims 7 and 10.

The defendants proposed this construction during the Markman hearing, arguing that the plain meaning of the word "therethrough" not only required the bore to pass completely through the clamp member but also that it be threaded throughout its entire length. The Court expressly rejected those arguments, stating:

> The parties dispute whether this language, specifically "therethrough," means that the bore for receiving the bolt must extend all the way through the clamp member, or merely into it, and whether the entirety of the bore must be threaded. The prior art (including the UK patent with an integral nut to receive the bolt) supports Wilson's contention that this claim requires the bore to pass all the way through the clamp member, and is consistent with

> the plain meaning of the admittedly archaic word
> "therethrough." As with the threaded bolt, however, <u>it is</u>
> <u>not strictly necessary that a "threaded bore" be threaded</u>
> <u>entirely</u>. Thus the Court construes this term to mean "a
> bore extending through the entirety of one clamp member,
> of which bore at least a portion is threaded."

(Dkt. No. 167 at 12) (emphasis added).

FWZ now advances a new argument, that the Court's construction is in error because a device with a partially threaded bore would not function. In its view, the only way to manufacture a partially threaded bore is to first drill a smooth bore and then machine threads into a portion of the smooth bore. Under such an assembly, the wider diameter of the threads would require a bolt too wide to pass through the unthreaded portion, and the device would not work.

This is not the only way to create a partially threaded bore, however, and nothing in the patent requires that it be manufactured in the manner FWZ proposes. The patent simply describes a "threaded bore extending therethrough," which conceivably could include a threaded portion that opens into a larger recess, or, as Walhonde contends, a threaded nut embedded into a smooth bore. A bore manufactured in these ways would function because the bolt could engage the bore's threads and still pass through the unthreaded portion. Although a jury ultimately should determine whether, in this case, a captive nut satisfies the element of a partially threaded bore, there is no reason to preclude the possibility of such a finding by narrowly construing the patent to require a fully

threaded bore where neither the patent itself nor its prosecution history supports such a construction.

Importantly, the '500 Patent does not describe the specific features of the bore other than to require a "threaded bore extending therethrough for treadably [sic] receiving the threaded portion of the bolt" to draw the clamp members together. This scarcity of detail reflects the relative insignificance of the bore itself, which is not the heart of the invention. Rather, the bore and bolt's central location in the clamp is the feature that achieved novelty by addressing the specific challenge boilermakers face when repairing large boiler tube walls in confined spaces.

This conclusion is bolstered further by the patent's prosecution history, which the Court may also consider when determining the meaning of a claim term. AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1052-53 (Fed. Cir. 2010). As discussed above, the PTO rejected original claim 2, which described bolt means connecting clamp members via a "threaded bore extending therethrough" because it lacked novelty unless combined with the central location of the bolt and bore, as described in original claim 3. The PTO explained that holding two clamps together with a bolt passing through a threaded bore was unpatentable over the British Patent, which "discloses a tube alignment clamp comprising clamp halves which are drawn together with a bolt and captive nut

arrangement." (Dkt. No. 218-3 at 152). That original claim 2 described a threaded bore and the British Patent called for a captive nut was immaterial to the PTO's conclusions because the novelty of the invention depended on the central location of the bolt and bore, not the specific features of the bore itself.

Therefore, as understood by a person of ordinary skill in the art within the context of the entire patent, a "threaded bore extending therethrough" need not be narrowly construed to mean only a bore threaded throughout its entire length. See Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005). Were the Court to construe "threaded bore" as narrowly as FWZ suggests, such construction would improperly assign greater significance to the specific characteristics of the bore than either the patentee or PTO afforded it at the time of invention. Accordingly, the Court will not revise its construction of the phrase, "one of said clamp members having a threaded bore extending therethrough," which it construes to mean "a bore extending through the entirety of one clamp member, of which bore at least a portion is threaded."

**D.**

In light of these conclusions, the Court finds there are genuine issues of material fact that preclude a grant of summary judgment as to infringement. At bottom, a jury must decide whether the captive nut arrangement in Wilson's tool either literally

satisfies or is equivalent to the element of the partially threaded bore described in claims 1-3 and 8 and referenced in the means plus function in claims 7 and 10.

Reasonable jurors could disagree as to whether inserting a threaded nut into a smooth bore literally constitutes a partially threaded bore or whether it "performs substantially the same purpose in substantially the same way to obtain the same result." AquaTex Indus. Inc. V. Techniche Solutions, 419 F.3d 1374, 1382 (Fed. Cir. 2005). For example, the record reflects conflicting evidence as to whether the use of a captive nut, as an element separate from the clamp member, redistributes loading on the device and whether that affects its function. (Dkt. No. 216-3 at 11-12). Likewise, the evidence suggests that a captive nut is more easily replaced than an entire clamp, but it is unclear whether that changes the overall utility of the clamp in a manner that substantially alters its purpose. (Dkt. No. 216-4 at 3-4).

Because the partially threaded bore either appears as an element or is referenced by a means plus function in each of the contested claims, whether a captive nut satisfies that element presents a genuine issue of fact that must be resolved prior to a finding of infringement or non-infringement.

### III.

The defendants also argue that the '500 Patent is invalid as obvious under the prior art. Although Walhonde has moved for summary judgment on the issue of invalidity, the defendants assert that genuine issues of material fact preclude such a finding.

### A.

Issued patents carry a presumption of validity, 35 U.S.C. § 282, and this presumption may only be overcome by clear and convincing evidence to the contrary. Bristol-Myers-Squibb Co. v. Ben Venue Labs, Inc., 246 F.3d 1368, 1374 (Fed. Cir. 2001). Under 35 U.S.C. § 103(a), a patent is invalid for obviousness where

> the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The ultimate determination of invalidity based on obviousness is a legal conclusion based on subsidiary factual issues, including (1) the scope and content of the prior art, (2) differences between the prior art and claims being challenged, (3) the level of ordinary skill in the art, and (4) "secondary considerations" such as commercial success, long-felt need, and the failure of others. Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966). Where, as here, the question is whether a patent claiming the combination of elements of prior art is obvious, "a court must ask whether the

improvement is more than the predictable use of prior art elements according to their established functions." KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 418 (2007). "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was independently known in the prior art." Id.

Where the patentee seeks a judgment that its patent claims are not invalid, it must show that the nonmoving party "failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." Eli Lilly & Co. v. Barr Labs, Inc., 251 F.3d 955, 962 (Fed. Cir. 2001). The Court must first determine whether the record raises any genuine issues of fact as to the Graham factors and then weigh the materiality of the dispute, "i.e., whether resolution of the dispute one way or the other makes a difference to the final determination of obviousness." Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1362 (Fed. Cir. 1998). "[T]he evidence must be viewed favorably to the nonmovant, with doubts resolved and reasonable inferences drawn in the nonmovant's favor." Id. at 1366.

**B.**

Here, there are genuine issues of material fact that preclude granting summary judgment as to invalidity. First, the scope of the relevant prior art is in dispute. "A patent reference qualifies as prior art for an obviousness determination under § 103 only when it

is analogous to the claimed invention," as defined by one of two
tests:

> (1) whether the art is from the same field of endeavor,
> regardless of the problem addressed and, (2) if the
> reference is not within in the field of the inventor's
> endeavor, whether the reference still is reasonably
> pertinent to the particular problem with which the
> inventor is involved.

In re Klein, 647 F.3d 1343, 1348 (Fed. Cir. 2011) (citing In re
Bigio, 381 F.3d 1320, 1325 (Fed. Cir. 2004)). Here, FWZ asserts
that eleven patent references define the prior art, but Walhonde
argues that four of those references are neither within the '500
Patent's field of endeavor nor pertinent to the particular problem
involved.[7] Walhonde's contention that these references concern a
problem that is not directly analogous to those facing the inventor
of the patent in suit raises a factual question that cannot be
resolved on summary judgment. See Commonwealth Scientific and
Indus. Research Organisation v. Buffalo Tech. (USA), Inc., 542 F.3d
1363, 1375 (holding that expert opinions that conflict as to the
scope of the relevant art create a genuine issue of disputed fact).

Second, the parties dispute the differences between the '500
Patent and the prior art, and whether it would have been obvious to

---

[7] Although Walhonde argues that FWZ's expert, Dr. Pond,
conceded during his deposition that none of the four contested
patents fall within the applicable field of endeavor or concern the
particular problem involved, Dr. Pond's responses actually reflect
a difference of opinion as to the scope of analogous prior art.
See (Dkt. No. 216-5 at 42-53).

a person having ordinary skill in the art to combine elements in
those references in the manner that constitutes the patent in suit.
FWZ's expert, Dr. Robert B. Pond ("Dr. Pond"), described in his
report the elements disclosed in the prior art, which included,
<u>inter alia</u>, alignment of tube sections for welding, the use of
threaded bores and captive nuts for drawing clamps together, and
arrangements for repairing single or multiple pipes or tubes. (Dkt.
No. 218-3 at 24-25). He then explained where these elements were
incorporated into the '500 Patent and opined:

> It would have been obvious to provide two clamp members
> connected by a pair of threaded bolts and a threaded
> bore, to provide recesses in each clamp member to receive
> a pair of tubes, and to provide an opening or aperture in
> the clamp members for welding access to the joint formed
> by the opposed tube ends.

<u>Id.</u> Although Walhonde contends that Dr. Pond's analysis of
individual elements fails to explain why a person of ordinary skill
would have been motivated to combine them, its argument underscores
the factual nature of the dispute that is at the core of the
obviousness issue presented in this case. <u>See</u> <u>Buffalo Tech.</u>, 542
F.3d at 1375-76. Because the problems addressed by the prior art
are sufficiently similar to the challenge of boiler tube wall
repair addressed by the '500 Patent, there is a factual question
whether a person of skill in the art would have looked to the
teaching of those references and been motivated to combine their
elements.

Finally, to the extent that the Walhonde Wallbanger satisfied a long-felt industry need and has enjoyed commercial success, such evidence of secondary considerations does not control the obviousness determination. <u>Rockwell</u>, 147 F.3d at 1366. Even where this evidence may be the most probative of obviousness, where, as here, there are genuine issues of material fact relating to the other <u>Graham</u> factors, secondary considerations alone are not sufficient to support a grant of summary judgment.

Accordingly, because genuine issues of fact exist as to the <u>Graham</u> factors, it cannot be said that FWZ has failed to produce clear and convincing evidence on any element of its invalidity defense, and a grant of summary judgment is not warranted.

**IV.**

The defendants also assert that Walhonde's conspiracy claim is preempted by federal patent law. The plaintiff failed to respond to the defendants' motion for summary judgment as to this issue, and, in any event, "conspiracy to infringe a patent" is "a theory which has no basis in law." <u>Int'l Rectifier Corp. v. Samsung Elecs., Co.</u>, 361 F.3d 1355, 1361 (Fed. Cir. 2004). Accordingly, Walhonde's conspiracy claim is preempted.

**V.**

For the reasons discussed, the Court:

1.    **DENIES** Walhonde's motion for summary judgment as to invalidity (dkt. no. 217);

2.    **DENIES** Walhonde's motion for summary judgment as to infringement (dkt. no. 215);

3.    **DENIES IN PART** FWZ, NAES, Minnotte, and Wilson Works' motions for summary judgment as to non-infringement and **GRANTS IN PART** their motions as to Walhonde's conspiracy claim (dkt. nos. 205, 207, 209, 211); and

4.    **GRANTS** Walhonde's motion for summary judgment as to Minnotte's counterclaims of inequitable conduct and false marking, which Minnotte concedes it cannot sustain (dkt. no 213).

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Order to counsel of record.

DATED: May 31, 2012

                                        /s/ Irene M. Keeley
                                        IRENE M. KEELEY
                                        UNITED STATES DISTRICT JUDGE